**BEVERLY ENTERPRISES, dba Beverly Manor Convalescent Centers, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1323.

United States Court of Appeals, Sixth Circuit.

Argued April 15, 1981.

Decided Oct. 8, 1981.

Ronald J. Santo, Joseph A. Ritok, Jr., Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for petitioner.

Elliott Moore, Linda Weisel, Deputy Associate Gen. Counsel, Washington, D. C., N. L. R. B., Bernard Gottfried, Detroit, Mich., for respondent.

Before LIVELY and KEITH, Circuit Judges, and RICE,* District Judge.

RICE, District Judge.

Beverly Enterprises (Beverly), a California corporation, operates one of its convalescent care centers in Petoskey, Michigan. The Petoskey center is capable of providing 24-hour basic and skilled nursing services for up to 120 resident patients.

In this case, Beverly seeks review of an order by the National Labor Relations Board (the Board) directing Beverly to cease and desist from refusing to bargain with the certified exclusive collective bargaining representative of certain employees at the Petoskey home. Beverly admits the refusal to bargain but maintains that the

* The Honorable Walter H. Rice, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

Board's order should be set aside because the bargaining unit certified by the Board, upon which the order is predicated, is incorrect. By cross-application, the Board seeks enforcement of its order.

I

Beverly's Petoskey facility is a one-story structure divided into three residential wings. The residents at the home are assigned among the wings according to the degree of care they require. Patients in the new south wing generally require more care than those in the north wing, and patients in the south wing generally require less care than those in either the new south or north wings.

The nursing staff at Petoskey consists of seven registered nurses (RNs), seven licensed practical nurses (LPNs), one graduate nurse (GN), and approximately thirty-five aides and orderlies. The nursing service department operates on three shifts with staff assignments made among the wings during each shift in order to achieve a level of coverage appropriate for the time of day and required degree of patient care. For example, there is generally no more than one aide or orderly assigned to the south wing during any given shift, but there may be as many as four aides or orderlies and two nurses assigned to the new south wing during the same shift. Similarly, the nurses assigned to the new south wing are ordinarily RNs, although an LPN or the GN may be assigned there during the afternoon or night shift; the north wing nurses are ordinarily LPNs or the GN, but an RN may be assigned there on occasion.

Beverly uses a "charge nurse" system to oversee nursing care on the wings. Normally, the RNs, LPNs, and GN are all designated as charge nurses, and have the responsibility of overseeing patient care on the wings and during the shifts to which they are respectively assigned. When two nurses are assigned to a particular wing during a given shift, one of them will assume the role as *the* charge nurse. The charge nurse on the new south wing also oversees the south wing since there is ordinarily no nurse assigned to that wing. Moreover, if no nurse is assigned to the north wing, as has happened during certain shifts in the past, the new south wing charge nurse will oversee patient care on all wings.

The aides and orderlies answer to the charge nurse for their wing. The charge nurses ordinarily report directly to the Director of Nursing who, in turn, reports to the Administrator of the facility. The Administrator and the Director generally work weekday hours paralleling the day shift. When the Administrator and Director are away from the home, the new south wing charge nurse is the most responsible employee at the facility.

Beverly also employs a single Ward and Central Supply Clerk at Petoskey. The supply clerk is responsible for the medical supplies inventory and prepares billing data for patient charges. The clerk's office is located on the new south wing, which is physically remote from the administrative offices. Medical supplies are stored in a room on the north wing but, from time to time, the clerk releases supplies from the storeroom for inventory at the nurses station on the north and new south wings. Items of supply delivered to the nurses station have charge slips attached which are filled in with the patient's name when the items are used. The supply clerk maintains billing control through these slips and must contact the nurses regarding discrepancies. The nurses contact the supply clerk when in need of specific supplies. The supply clerk also assists the center's social worker in reviewing medical records, and fills in for the Administrator's secretary during absences.

II

In July, 1978, the United Steelworkers of America, AFL–CIO–CLC (the Union), filed two petitions [1] with the Board seeking certi-

1. In one petition, the Union sought to represent "[a]ll service and maintenance employees including Licensed Practical Nurses . . ." but ex-

fication as the exclusive bargaining representative for certain employees at the Petoskey center, including LPNs and the supply clerk. The petitions were consolidated and, on September 20, 1978, following three days of hearings, the Board's Regional Director issued a Decision and Direction of Election. In that Decision, the Regional Director determined that LPN charge nurses at Petoskey are not "supervisors" under the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, and that the Ward and Central Supply Clerk at Petoskey has a "substantial community of interest" with other service and maintenance employees. The Regional Director therefore concluded that LPNs and the supply clerk would be included in the bargaining unit. The Board denied Beverly's request for review of the Regional Director's decision.

The representation election was held on October 18, 1978. Thirty-one out of fifty-four ballots cast favored the Union, with one ballot challenged. Beverly's objections to the conduct of the election were overruled. The Union was certified by the Regional Director as the exclusive bargaining representatives of service and maintenance employees at Petoskey, including LPNs and the supply clerk, on December 1, 1978.

Thereafter, Beverly refused to bargain with the Union. On June 4, 1979, in unfair labor practice proceedings based upon Beverly's refusal to bargain, the Board declined to reconsider inclusion of the LPNs and supply clerk in the bargaining unit as certified in the 1978 representation proceedings. Since Beverly otherwise admitted its refusal to bargain with the Union, the Board issued its order directing Beverly to bargain.

This Court has jurisdiction over Beverly's petition for review, and the Board's cross-application for enforcement of the June 4, 1979, order pursuant to section 10 of the NLRA, 29 U.S.C. § 160. Because Beverly admits its refusal to bargain but justifies its conduct solely upon the over-inclusiveness of the certified bargaining unit, our review is effectively and appropriately directed only to the correctness of the Regional Director's September 20, 1978, bargaining unit determination, upon which the Board's June 4, 1979, order is based.[2] *See Boise v. Greyhound Corp.*, 376 U.S. 473, 476–77, 84 S.Ct. 894, 896–97, 11 L.Ed.2d 849 (1964).

III

Section 2(11) of the NLRA, 29 U.S.C. § 152(11), defines a "supervisor" as:

> . . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The kinds of supervisory authority enumerated in section 2(11) are in the disjunctive but, regardless of the specific kind of supervisory authority at issue, its exercise must involve the use of true independent judgment in the employer's interest before such exercise of authority becomes that of a supervisor. *NLRB v. City Yellow Cab Co.*, 344 F.2d 575, 580–82 (6th Cir. 1965); *Eastern Greyhound Lines v. NLRB*, 337 F.2d 84, 87 (6th Cir. 1964). Supervisors are not employees under the NLRA, 29 U.S.C. § 152(3), and no employer may be required to bargain with his supervisors, 29 U.S.C. § 164(a).

In 1974, Congress indicated its awareness of the difficulties in applying the section 2(11) definition of supervisor to profession-

cluding "professional employees and supervisor at defined in the Act." In the second petition, the Union proposed a separate unit consisting solely of LPNs. The second petition was mooted by the parties' stipulation at the hearing that, if LPNs were not supervisors, it would be appropriate to include them in the first petition's unit.

2. For this reason, where the meaning allows, we refer to the Board and Regional Director interchangeably.

als in the health care field. The problem in application is due to the fact that health care professionals often exercise certain kinds of supervisory authority in treating those under their care, but they do so in the exercise of independent *professional* judgment not always strictly "in the interest of the employer." Nonetheless, Congress declined to amend section 2(11) to exclude health care professionals from the definition of supervisor, as was suggested at the time of the 1974 NLRA Health Care amendments. Rather, the Senate Labor Committee report accompanying the 1974 law indicated that the proposed exclusion was thought "unnecessary because of existing Board decisions." S.Rep.No. 766, 93d Cong., 2d Sess. —, *reprinted in* [1974] U.S. Code Cong. & Ad.News 3946, 3951. The Committee expressed its approval of pre-1974 Board Decisions in the following manner:

> The Committee notes that the Board has carefully avoided applying the definition of "supervisor" to a health care professional who gives direction to other employees in the exercise of professional judgment, which direction is incidental [to] the professional's treatment of patients, and thus is not the exercise of supervisory authority in the interest of the employer.
>
> The Committee expects the Board to continue evaluating the facts of each case in this manner when making its determinations.

*Id.*

The question of supervisory status is "a mixed one of fact and law." *Cf. NLRB v. Yeshiva University,* 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980) (respecting the similar, judicially-crafted exception for "managerial" employees). However, as should be evident from the array of criteria within section 2(11), the inquiry is predominantly factual. Further,

> [e]veryday experience in the administration of the statute gives [the Board] familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question, like determining whether unfair labor practices have been committed, "belongs to the usual administrative routine" of the Board.

*N.L.R.B. v. Hearst Publications, Inc.,* 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944) (citations and footnote omitted). For this reason, the Board's factual findings are conclusive upon review "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f).

█ To the extent that the Board's conclusion upon its factual findings involve determinations of law, the Supreme Court has also said:

> Undoubtedly, questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute. But where the question is one of specific application of a broad statutory term [e. g., "supervisor"] in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited.

*Hearst Publications, supra* at 130–31, 64 S.Ct. at 860 (citations omitted). Thus, in sum, "the Board's determination that specified persons are 'employees' [or 'not supervisors'] under this Act is to be accepted if it has 'warrant [support] in the record' and a reasonable basis in law." *Id.*

In the present case, the Regional Director recognized that the evidence at the representation hearing regarding the supervisory authority of LPNs was "somewhat contradictory." Specifically, the Regional Director pointed to conflicting testimony regarding the existence of LPN authority: (1) to independently call in extra help, approve overtime, approve absences, and re-

lease employees early; (2) to submit effective evaluations of employees which have a bearing on promotions or wage increases; and (3) to actually discipline employees, or submit effective disciplinary reports which have a bearing on the discipline actually given employees. Despite the conflicting evidence, the Regional Director concluded that the LPN's exercise of authority in the first category of supervisory activities is purely routine, involving no independent judgment, and that the LPN's participation in the evaluation and disciplinary process, within the second and third categories, is more in the nature of a reporting function, not amounting to *effective* recommendations of appropriate personnel action.

Beverly challenges the Regional Director's findings in each of these areas as "clearly erroneous." On balance, however, we think that Beverly seeks review of the Regional Director's credibility determination and his assessment of the *conflicting* evidence presented to him, rather than a review based on the sufficiency of support for what the Regional Director did find. The statute precludes Beverly's approach to these matters. We must defer to the findings below if supported by substantial evidence on the record as a whole, "even though we might have decided the matter differently ourselves had the matter been presented *de novo.*" *NLRB v. St. Francis Hospital,* 601 F.2d 404, 422 (9th Cir. 1979).

For example, Beverly questions the Regional Director's treatment of an incident involving an employee who showed up for work late and in an intoxicated condition. The evidence indicated that an LPN ordered the employee to leave, saying something like "I do not want to ever see you again." Beverly says that this amounted to the discharge of the employee by that LPN, and the incident should, therefore, be viewed as an example of the supervisory authority of LPNs at Petoskey. However, the evidence also indicated that the center's Administrator was immediately informed of the incident, directed the LPN to document it, and then contacted the employee the next day to terminate him. The Regional Director reasonably concluded from this evidence that the *Administrator* discharged the employee, albeit upon the LPN's report, and that the LPN neither discharged him nor effectively recommended such action.

Similarly, Beverly questions the Regional Director's account of the Administrator's testimony indicating that LPNs have had certain kinds of supervisory authority, of the type within the first category, above, "if at all, only since May of [1978]." We do not think, as Beverly contends, that this account indicates a misunderstanding of the Administrator's testimony, or that it ignores the significance of present authority under the law. As we read the Regional Director's decision, that account, in context, does not accept the Administrator's testimony, but merely characterizes it in its best light for comparison with other evidence on the record submitted by Beverly, which evidence did not sufficiently show that there had been any change in LPN authority in May, 1978, contrary to the Administrator's testimony.

■ We need not detail Beverly's other contentions regarding LPN authority in the three categories enumerated above. Ultimately, the question is not whether the LPNs at Petoskey have authority to adjust other employee schedules in accordance with the vagaries of manpower needs. They certainly do, at least on occasion, and the Regional Director so found. The crucial question is whether the exercise of such authority is routine or involves independent judgment. The Regional Director found that in each instance, the exercise of authority was routine. This finding has warrant or support in the record taken as a whole and will not be disturbed. Similarly, the question is not whether the LPNs play any part in the employer's determination to retain, reward, or discipline other employees. The LPNs certainly do participate in these personnel actions, by submitting evaluations and disciplinary reports, and the Regional Director so found. The crucial question is whether the LPNs participation in these personnel actions amounts to *effective* recommendations that the retention,

reward, or discipline be given. The Regional Director found that they did not. Again, these findings have warrant or support in the record and will not be disturbed.

IV

■ The Board's conclusion regarding the nature of LPN authority, in the three categories of supervisory activity enumerated, above, is not the only subject of our review. The Regional Director also found, without dispute, that the LPNs at Petoskey have authority to independently assign and direct the work of aides and orderlies within their wings. But the Regional Director noted that the exercise of this authority is "based on the Charge Nurse's assessment of the employee's abilities and the needs of the patients." He further stated:

> In determining whether various nursing personnel are supervisors, the Board has cautioned that the Congressional directive to distinguish true supervisory authority from the "professional" judgment and discretion involved in patient care by RNs and LPNs must not be ignored. [Citation omitted] .... [T]he LPNs here make assignments of work, report infractions, write evaluations, in conjunction with their patient care responsibilities. On balance, I find the LPNs' duties to be primarily those concerned with patient care and their actions to be taken pursuant to that care, and not as the product of independent judgment.

As explained below, we have a substantial degree of difficulty in reconciling the ambiguities in this passage and, as a result, in understanding exactly what the Regional Director meant by it. However, we do think that its tenor and possible intended meaning reflect a basic misunderstanding or misapplication of the "Congressional directive" in 1974. For this reason, we cannot conclude that the Board's determination to include LPNs in the Petoskey bargaining unit has a "reasonable basis in law," and, therefore, the Board's order will not be enforced.

As the Regional Director correctly noted, it is the intent of Congress in the health care field that the Board "distinguish true supervisory authority from the 'professional' judgment and discretion involved in patient care. . . ." The distinction must be made, not because professional care is a matter of routine involving no independent judgment, but because the independent judgment which is necessarily involved in patient care, even if otherwise supervisory in character, is not always strictly "in the interest of the employer." The exercise of proper independent professional judgment in directing employees, therefore, should not *alone* align the professional with his employer as a supervisor.

Although the Regional Director correctly stated the basic principle, his decision does not reasonably indicate that he correctly applied it; his articulated reasons do not support the result reached. Thus, it is at least ambiguous for the Regional Director to speak of the "'professional' judgment and discretion involved in patient care" and then find that the LPNs are not supervisors because their supervisory activities are "concerned with patient care . . . and not . . . the product of independent judgment." Either the LPNs are not supervisors because they do not exercise independent judgment in their assignment and direction of the aides and orderlies, or they are not supervisors because they exercise independent judgment professionally, but not in the interest of the employer.

We conclude from the tenor of the Regional Director's decision that he did not accept either of these rationales but, instead, may have reached his determination to include LPNs in the bargaining unit *simply because* their supervisory activities in assigning and directing subordinate employees were "in conjunction with their patient care responsibilities." The Regional Director failed to clearly articulate whether he had determined that LPN activities respecting patient care either did not involve independent judgment, or did involve independent professional judgment not in the interest of the employer, thereby leaving the impression that he considered the "conjunction with patient care" *alone sufficient* for nonsupervisory status.

This characterization of the Regional Director's approach is also evidenced by other parts of his decision. As indicated in note 1, *supra*, the Union did not seek to represent any "professional employee" as defined in the NLRA. *See* 29 U.S.C. § 152(12). Accordingly, the general bargaining unit definition to which the parties stipulated, excluded professional employees. Although the parties did not stipulate to the supervisory status of RNs at Petoskey, the Regional Director excluded them from the unit as professional employees because that status "generally is accorded to RNs." Yet when the Regional Director discussed LPN authority to assign work, he spoke of the " 'professional' judgment and discretion involved in patient care *by RNs and LPNs.*" (It is also interesting to note that the 1974 legislative history regarding the supervisory status of health care "professionals" mentions RNs, but not LPNs, contrary to the Regional Director's statement.) Thus, it would appear that the Regional Director might have excepted LPNs from supervisory status, not because they exercise discretion *as professionals*, but because a sort of "professional" judgment and discretion is ordinarily involved in patient care. In other words, the Regional Director might have included LPNs in the unit *solely because of their patient care responsibilities, and not because any exercise of their discretion in caring for patients is not in the employer's interest.*

The position taken by the Board, in opposition to Beverly's contention that the unit determination in this case constitutes substantial departure from Board precedents, is also very significant in this regard. The Board argues in brief that the precedents upon which Beverly relies for the indicated proposition "have only limited precedential value" because they were decided prior to the 1974 NLRA Health Care amendments. This argument reflects a clearly erroneous belief that the 1974 amendments somehow altered the pertinent law, or changed the way in which the Board should approach the question of the supervisory status of health care professionals.

The fact is that although Congress was requested to effect change in the law in this area in 1974, it specifically declined to do so. See, *supra*, at 1098–1099. Moreover, Congress specifically approved of the Board's pre-1974 decisions and pre-1974 analytical method of dealing with the supervisory classification of health care professionals. Thus, rather than diminishing the persuasiveness of the pre-1974 health care cases upon which Beverly relies, Congress' action in 1974 enhances the "precedential value" of those decisions.[3]

3. We do not mean to suggest that a substantial similarity in circumstances between this case and any of the pre-1974 decisions upon which Beverly relies would be reason enough to conclude that the Board should have excluded the LPNs from the bargaining unit, herein, as it excluded other nurses in the pre-1974 cases. We are acutely aware that the question of supervisory status predominately involves a factually intensive inquiry into the circumstances of each individual case, and that even a minor difference in the evidence (which would appear insignificant to a layman or to a court) might, in the Board's expert sense of things, properly be considered sufficient reason to reach a different outcome. For example, in *Sherewood Enterprises, Inc.*, 175 N.L.R.B. 354 (1969), the Board determined that the nurses' evaluations and training reports of subordinates were uniformly the sole determinant of subordinate retention and merit pay increases. In the present case, the evidence indicates (as the Regional Director found) that the Director of Nurses only accepted the nurses' evaluations if they were not critical, and in the only case on record where a subordinate received a poor evaluation, the Director of Nurses sought out other information. This difference in the evidence is sufficient to reconcile the Board's determination in *Sherewood* that the nurses did *effectively* recommend personnel actions, with the determination that the LPNs do not *effectively* recommend such actions at Petoskey. Similarly, in *Rosewood, Inc.*, 185 N.L.R.B. 193 (1970), the Board concluded that LPN charge nurses who occupied positions in a managerial heirarchy similar to Petoskey, were supervisors because of the *effectiveness* of their authority to, *inter alia*, recommend wage increases, discipline, hiring and discharge. The Court assumes that the factual effectiveness of the authority in *Rosewood* had support in that record taken as a whole, just as we conclude that the *lack* of such *effective* authority has support, herein.

But again, our concern is not with the Board's assessment of the evidence in this case respecting these kinds of supervisory activity,

The Board's erroneous belief that the law regarding the supervisory status of health care professionals changed in 1974, further strengthens our conclusion that the Regional Director may have accorded nonsupervisory status to the LPNs in this case *simply because* their activities in assigning subordinates relates to patient care. This standard does not correctly state Congress' intent as evidenced by the 1974 legislative history. On the contrary, it extends the exception for the "direction [of] employees in the exercise of professional judgment . . . incidental to the professional's treatment of patients, . . . *not . . . in the interest of the employer [,]*" to effectively encompass nearly every activity by a health care professional who has authority to direct employees and also has patients under his care.

Congress obviously did not intend to broadly accord nonsupervisory status in the manner suggested by the Regional Director. As we have indicated, the exercise of professional judgment in directing employees when treating patients is not always the exercise of authority strictly in the interest of the employer. But, on the other hand, the exercise of professional judgment in directing employees and the interest of the employer are not always mutually exclusive. Thus, in *Avon Convalescent Center, Inc.*, 200 N.L.R.B. 702 (1972), *enforced per curiam*, 490 F.2d 1384 (6th Cir. 1974), of which Congress implicitly approved in 1974, and upon which Beverly relies, herein, certain nursing home nurses were deemed to be supervisors because they assigned and responsibly directed other employees. In reaching this determination, the Board said:

> In a nursing home servicing elderly and sick patients whose critical needs may momentarily require variations in standard procedures, the nurse responsible for the supervision of other nurses or a shift or a section *must obviously be prepared to exercise her discretion in utilizing her training and experience and assign and direct employees placed under her authority more than clerically or routinely.* Furthermore, power to enforce important personnel policies, rules, and regulations is certain to require the exercise of independent judgment. Although the record does not establish that the nurses here in question hire, fire, or mete out discipline or directly recommend such action, their power to enforce major personnel policies and rules, short of such authority, is compelling evidence that their direction and assignment of employees is substantial and meaningful.

*Id.* at 706 (emphasis added).

We think that the Regional Director's decision in the present case, regarding the non-supervisory status of LPNs at Petoskey, suggests a *sub silentio* departure from the analytical method employed by the Board, pre-1974, and, therefore, a substantial deviation from the "Congressional directive" in 1974. It is incumbent upon the Board to distinguish between professional direction of employees and direction in the interest of the employer. The confusing and "conclusory rationales," *NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980), employed by the Regional Director in addressing that matter in this case, do not indicate that the distinction was made, but do indicate that the Regional Director simply decided that LPN activity "in conjunction with," "concerned with," or "pursuant to" patient care responsibilities *necessarily would not be supervisory.* This approach has no reasonable basis in the law.

Since we have determined that the Board's inclusion of LPNs in the Petoskey bargaining unit lacks an articulated, reasonable basis in the law, the Board's order that Beverly must bargain with that unit will not be enforced.

Further, although the exclusion of a number of votes equal to the seven LPNs at issue would not, mathematically, have altered the result of the representation elec-

or with the Board's ability to distinguish the facts in the pre-1974 cases. Our concern is with the Board's present understanding of the applicable law, and the lack of an articulated, reasonable basis under the law for reaching the conclusion that LPNs at Petoskey do not assign or direct work as supervisors.

tion upon which the bargaining order is based, there is a substantial possibility that the exclusion of LPNs from the bargaining unit might have produced different votes by other unit members and thereby altered the election's outcome. For this reason, we do not think it appropriate for us to enforce the order with any modification of the unit definition, even if we would definitely conclude that LPNs should not be included in the unit. We conclude that the bargaining order must be set aside and the case returned to the Board for further proceedings consistent with this opinion.

V

We find no error in fact or law in the Board's determination to include the supply clerk in a Petoskey bargaining unit which included LPNs. It is noted that, in 1974, Congress expressed its approval of the Board's "preventing proliferation of bargaining units in the health care industry," and, specifically, the Board's "trend toward broader units" in that field. S.Rep.No.766, 93d Cong., 2d Sess. ——, *reprinted in* [1974] U.S.Code Cong. & Ad.News 3946, 3950. Although the supply clerk at Petoskey might in the abstract, be considered more of a "clerical" employee [4] than a service or maintenance employee, the record is sufficient to establish a "community of interest" with other members of the unit (as the unit had otherwise been defined by the Regional Director) pursuant to this "Congressional directive."

Therefore, were it not for the fact that we question the lack of an articulated basis for including LPNs in the unit, we would defer to the Board's expert findings and conclusions in the matter of the supply clerk (which do have "warrant in the record and a reasonable basis in the law"). However, the Regional Director's decision is unclear as to whether the supply clerk should be included in the unit *solely* because of an alliance in interest with aides and orderlies in the unit,[5] or also because of the clerk's daily contacts with all nursing personnel at Petoskey [6] including the LPNs whose inclusion in the unit we question. In setting aside the order and returning the matter for further proceedings respecting the LPN's inclusion, we expect the Board to address this aspect of supply clerk's inclusion in the unit should the Board determine that LPNs are not to be included.

Enforcement of the June 4, 1979, order of the Board is denied. The order is set aside.

It is the order of this Court that the captioned cause be remanded to the Board with specific instructions that the Regional Director review the record of the proceedings leading to the September 20, 1978, Decision and Direction of Election in order to reconsider inclusion of the LPNs and the supply clerk in the bargaining unit, by mak-

4. The general bargaining unit definition to which the parties stipulated excludes "office clerical employees."

5. The supply clerk wears the same uniform and badge, and receives approximately the same wage and benefits as aides and orderlies.

6. Beverly's two challenges to the Regional Director's factual findings regarding the supply clerk are both related to the question of the extent of the supply clerk's contacts with other unit members. Both are without merit.

First, Beverly contends that the Regional Director erred in concluding that during the 40% of the time the clerk is not in her office, she is "on the various wings" in contact with other unit members. Beverly says that the 40% of the clerk's time is actually divided between the central storeroom, social worker's office and administrative offices. Unfortunately, the Regional Director did not conclude that 40% of the clerk's time is spent on the wings, but only 25% to 30%. This finding is supported by the Administrator's testimony. The remaining 10% to 15% of the clerk's time may well be spent in the other work areas Beverly identifies.

Second, Beverly contends that the Regional Director erred in finding that the supply clerk has an "accounting function" in common with other unit employees. Beverly says the other unit employees have no such function. But, again, the Regional Director did not reach the conclusion Beverly ascribes to him. The Regional Director found that the supply clerk "must work directly with [other unit members] to maintain proper accounting for supplies used. . . ." In other words, regardless of the other employees' functions, the clerk's accounting function necessitates her contacts with them. This finding is supported by the record.

ing specific findings on the following questions:

1. Do LPN activities respecting patient care involve independent professional judgment? If not, LPNs are properly included within the bargaining unit.

2. If so, is that independent professional judgment exercised primarily in connection with patient care, not in the interest of his or her employer, *or* is it exercised in the interest of his or her employer?

If the second question is reached and answered that the independent professional judgment of a supervisory character is exercised primarily in connection with patient care, not in the interest of his or her employer, then, pursuant to the above opinion and the present state of the law, LPNs at Petoskey are properly included within the bargaining unit. On the contrary, should the second question be reached and answered that the exercise of the LPNs' independent professional judgment of a supervisory character is in the interest of his or her employer, and not merely in the interest of patient care, then, equally clearly, LPNs at Petoskey should not be included in the bargaining unit.

Should the Board, upon reconsideration, determine that LPNs are not to be included in the bargaining unit, the Board is to state, upon review of the hearing transcript, whether the supply clerk is to be included in the bargaining unit because of an alliance and interest with aides and orderlies in the unit alone, *or* also because of the clerk's daily contact with all nursing personnel at Petoskey. If the supply clerk's inclusion into the bargaining unit is strictly because of an alliance and interest with clerks and orderlies in the unit, the Board's original decision should be affirmed. On the contrary, should the Regional Director conclude that the supply clerk's inclusion in the bargaining unit was also because of daily contact with all nursing personnel at Petoskey, including the LPNs which, upon reconsideration, are found not to belong in the bargaining unit, the supply clerk's inclusion in the bargaining unit must be reversed or, at least, reconsidered.