943 F.2d 52
 138 L.R.R.M. (BNA) 2160, 121 Lab.Cas. P 10,164
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 SEWELL-ALLEN BIG STAR, INC., Baker Bros., Inc., d/b/a
Baker's Big Star Stores Nos. 31, 61, 64 and 81, Gilbert
Allen Big Star, Inc., d/b/a Big Star No. 142, Sewell-Allen
Big Star, Inc., Nos. 103, 187, and 189, SMF Management,
Inc., d/b/a SMF Food Rite Supermarkets, Petitioners, Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
United Food and Commercial Workers, Local 1529, AFL-CIO, Intervenor.
 
 Nos. 89-5730, 89-5868.
 United States Court of Appeals, Sixth Circuit.
 Aug. 23, 1991.
 Before MILBURN and DAVID A. NELSON, Circuit Judges, and ENGEL, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 The National Labor Relations Board found that each of the petitioners in this case committed an unfair labor practice by refusing to recognize a local union following the expiration of collective bargaining agreements with the local. The Board rejected an argument that the local did not have to be recognized because it had merged with another union some seven months before the collective bargaining agreements expired. The Board also found that one petitioner had waged an anti-union campaign by discharging and demoting employees for union activities and soliciting employees to sign a decertification petition, and that another petitioner had sponsored a decertification petition through "supervisors" who were in fact members of the bargaining unit. The petitioners seek review of the Board's order, and the Board cross-petitions for enforcement. We shall deny the petition for review and grant the Board's cross-petition for enforcement.
 
 
 2
 * The petitioners (or "the companies") independently operate retail grocery stores in the Memphis, Tennessee, area. Prior to January of 1982 the companies' meat department employees were represented by Local 452 of the United Food and Commercial Workers International Union (UFCW). Each unit was covered by a collective bargaining agreement that was scheduled to expire on October 30, 1982.
 
 
 3
 * Local 452 was originally part of the Amalgamated Meat Cutters and Butcher Workers of North America. In 1979 Amalgamated merged with the Retail Clerks International Union to form the UFCW. This merger did not directly affect Local 452. In January of 1982, however, the executive board of Local 452 agreed to merge the local into UFCW Local 1529, formerly a local union of the Retail Clerks International Union. The merger was voted on at bargaining unit meetings held in February. The members of Local 452 approved the merger by a vote of 432 to 72. The UFCW likewise approved the merger, and it became effective on April 1, 1982. All assets of Local 452 were transferred to Local 1529. The president of Local 452, Mike Mancini, became secretary-treasurer of Local 1529; the secretary-treasurer and chief executive officer of Local 452, Bill Lambert, became a consultant to Local 1529. Mancini and several other Local 452 officials moved their offices to those of Local 1529.
 
 
 4
 On April 7, 1982, Mancini, as "Secretary-Treasurer U.F.C.W. Local 452," sent letters to the companies informing them of the merger. Attached to Mancini's letter was another letter, signed by officials of each local, stating that "with the approval of the memberships, [the locals] have effected a merger" effective April 1, 1982; that the merged unions would operate as Local 1529; and that "the merger in no way affects the autonomy of the Local Union and, in any event, is purely an internal matter having no affect [sic] on the relationship between Local No. 452 and [the company]."
 
 
 5
 The labor agreements between the union and the companies continued to be administered in the usual way following the merger. Grievances were accepted and processed, union dues were deducted and sent to Local 1529, contributions were made to health and pension funds, and representatives of Sewell-Allen and Baker Brothers met with the union in June to negotiate an increase in health and welfare premiums. As early as May 28 and 31, the attorneys for Baker Brothers and Sewell-Allen acknowledged their understanding that "Local 452 has been merged into Local 1529."
 
 
 6
 None of the companies challenged the merger until after the contracts had expired. During a bargaining session with Local 1529 Dan Allen, president and co-owner of Sewell-Allen, asked if nonmembers had voted on the merger (they had not), but neither he nor anyone else connected with the companies took any action before the contract expired.
 
 
 7
 On September 8 Sewell-Allen Big Star Store 189, acting through its attorney, expressed a willingness to initiate bargaining with Local 1529 at a mutually agreeable time. On November 8, 1982, however, the companies notified the union that they no longer recognized it as their employees' bargaining representative. The stated reason was that nonmember employees had not been allowed to vote on the merger.[1] The companies unilaterally granted wage increases thereafter. SMF, Sewell-Allen, and Baker Brothers refused to process grievances, and Baker Brothers refused to remit to the union dues that had been deducted from employees' pay.
 
 B
 
 8
 On June 28 the meat department supervisor of Sewell-Allen's Big Star Store 103, Clifford Phillips, told an employee, Johnnie Worrell, that Sewell-Allen wanted the employees to get out of the union because of the merger. He added that working conditions would be better without the union. On June 30 store manager Michael Gordon spoke to Worrell about withdrawing from the union. Gordon suggested that the union might force the store to close. On July 12 company co-owners Lex Sewell and Dan Allen made similar representations to Worrell. In early August Sewell and Allen told several other employees that benefits would be better without the union. When one employee, James Kimbrough, asked what would happen if he stayed in the union, either Sewell or Allen replied that his family would be out on the street and he would be out of a job. In November of 1982 Sewell, Allen, and Gordon saw Kimbrough passing out literature soliciting union membership. Kimbrough was discharged the following January, at which time Gordon told him that there was too much help in the meat department.
 
 
 9
 Phillips offered Leroy Dancer, a part-time meatcutter, more hours if he would circulate a decertification petition. On August 25 Gordon gave Dancer a petition stating "[w]e want out of the Union" and told him how to file it with the NLRB. Gordon also told him, several times, "[n]ow, remember, this is your idea." When Dancer expressed doubt that the company could win a decertification election, Gordon showed Dancer the new work schedule and said: "It is even, even now. These people are no longer with us." Gordon named three workers (Heist, Hordyk, and Gross) who had been discharged the previous week.
 
 
 10
 Sewell-Allen demoted Phillips from supervisor to head meatcutter, also on August 25, and moved Johnnie Worrell from head meatcutter to journeyman meatcutter. As head meatcutter, Phillips was a member of the bargaining unit and could therefore sign the decertification petition. On August 27 Phillips summoned each employee on duty into his office to see Dancer, who asked each to sign the petition. Dancer filed the petition with the Board later that day.
 
 
 11
 The company claims that the discharges of Heist, Hordyk, Gross, and Kimbrough were economically justified. Although the sales volume of Sewell-Allen's meat department remained steady, Sewell-Allen claims that fewer full-time employees could handle the same workload more efficiently than many part-timers. Also, the workload decreased because in July the store began buying boxed rather than hanging beef; in August it began ordering pre-packaged chickens; and in October it began buying boneless chucks, all of which reduced the amount of meat cutting necessary. Sewell and Allen testified that they were unaware of any union activity by Heist and Hordyk before they were discharged. Sewell and Allen claim that Gross was discharged because he only worked eight hours a week and could not work the night shift where, pursuant to a union grievance, they needed more staffing. As for Kimbrough, they claim that he was discharged not because of pro-union activities but because he was the least senior employee at the time. They assert that after the discharges the store was able to maintain the same dollar sales volume with 90 fewer hours per week and no increase in overtime.
 
 C
 
 12
 In July and August of 1982 Mike Hamm, head meatcutter at Baker Brothers Store No. 61, asked several employees to sign a petition to decertify the union. He told other employees that Baker Brothers would not sign a new contract with the union, and he promised better working conditions without the union. At roughly the same time Todd McClellan, head meatcutter at Baker Brothers Store 81, asked three employees to sign a decertification petition. He told two employees that they would make more money without the union, and he warned another that Baker Brothers would not negotiate with the union. In early August John Westmoreland, a "roving" head meatcutter, questioned an employee, Charles Mayfield, about the union and told him that his hours would be cut or he would lose his job if he voted for the union. Hamm, McClellan, and Westmoreland were bargaining unit employees.
 
 
 13
 Three weeks after Westmoreland questioned Mayfield, Alvin Baker, president and co-owner of Baker Brothers, approached Mayfield at work. He told Mayfield that Westmoreland had told him that Mayfield had been harassed by someone from the union. Baker told Mayfield to let him or Westmoreland know if it happened again.
 
 
 14
 After the decertification petition was filed on August 9, Baker met with the meat department employees at each of his stores. He told them that he understood an overwhelming majority of employees had signed the petition and that he appreciated those people who had. He also promised that the company would run "smoother" after they got rid of these "interruptions." Baker says he told the employees that they would not lose pay or benefits regardless of the results of the election.
 
 D
 
 15
 Accepting a recommendation and opinion of the administrative law judge, the Board found that all four companies had violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by withdrawing recognition from and refusing to bargain with Local 1529. The Board agreed with the ALJ that the six-month statute of limitations barred any defense based on procedural defects in the merger vote, and it agreed that the companies were estopped from asserting such a defense because they had treated Local 1529 as the employees' representative after the merger. The Board also found that Sewell-Allen and Baker Brothers committed independent violations of §§ 8(a)(1) and (5) of the Act by sponsoring decertification petitions and encouraging employees to get out of the union. The Board rejected Baker Brothers' argument that it was not responsible for the statements of its head meatcutters. The Board also found that Sewell-Allen's discharges violated §§ 8(a)(1) and (3).
 
 II
 
 16
 * Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), prohibits the filing of an unfair labor practice charge with respect to events occurring more than six months before the filing. This six-month limitation period applies as well to defenses based on unfair labor practices. NLRB v. Marin Operating, Inc., 822 F.2d 890, 893 (9th Cir.1987). Section 10(b) also bars a charge based on an unfair labor practice occurring within the six-month period if adjudication of the charge would require determining whether events outside the limitations period also violated the Act. Local Lodge No. 1424, Int'l Ass'n of Machinists v. NLRB (Bryan Mfg. Co.), 362 U.S. 411, 416 (1960). A company cannot defend its refusal to recognize a union based on an allegedly invalid merger if the merger occurred outside the § 10(b) limitations period and the employer continued to recognize the union. Joe Costa Trucking Co., 238 N.L.R.B. 1516, 1517, 1521-22 (1979), enf'd sub nom. NLRB v. Edjo, Inc., 631 F.2d 604 (9th Cir.1980). See also North Bros. Ford, Inc., 220 N.L.R.B. 1021 (1975) (company could not challenge union's status as lawful successor to the previous union because company had recognized the union more than six months earlier). We see no reason not to follow these decisions here.
 
 
 17
 Although an employer is not usually free during the term of a collective bargaining agreement to withdraw recognition from the union with which it negotiated the agreement, Abbey Medical/Abbey Rents, Inc., 264 N.L.R.B. 969 (1982), enf'd, 709 F.2d 1514 (9th Cir.1983), recognition may be withdrawn if the union becomes defunct or a schism occurs. Yates Industries, Inc., 264 N.L.R.B. 1237, 1249 (1982). A merger of two local affiliates of the same international union does not automatically relieve the employer of the obligation to bargain with the successor union, but deficiencies in the voting process could affect a company's obligation. Id. at 1249. The Board observed in the present case that the companies would have been "entirely within their rights" to refuse to deal with the union had they determined that Local 1529 was not a successor pursuant to a valid merger. But the companies concede that they received prompt notice of the merger and did not question it. We agree with the Board that the notice of merger was unambiguous.
 
 B
 
 18
 We also accept the Board's conclusion that the companies are estopped from challenging the merger because they continued to deal normally with the new local until the contracts expired. In June of 1982 Sewell-Allen and Baker Brothers bargained with Local 1529 over an increase in insurance payments. Although SMF and Gilbert Allen did not engage in such bargaining, none of the petitioners questioned Local 1529's status when Leon Sheppard, chief executive officer of Local 1529, wrote to each in July concerning bargaining for a new contract. SMF and Gilbert Allen provided some of the information Sheppard requested, and Sewell-Allen Big Star Store 189 expressed willingness to begin negotiations. All of the petitioners also continued to remit dues in the usual manner.
 
 
 19
 Citing Knapp-Sherrill Co., 263 N.L.R.B. 396 (1982), the Board found that by this conduct the companies recognized Local 1529, and that such recognition barred them from subsequently challenging the validity of the merger. In Knapp the Board held that the employer waived its right to challenge the procedures employed in a merger between two locals where it had notice of the merger, where it treated the new local as its employees' bargaining representative, and where the union relied on the employer's apparent acquiescence in the merger by taking no steps to reestablish its majority status. In the case at bar, as in Knapp, the companies were informed of the merger very shortly after it became effective, and they treated the merged entity as their employees' bargaining representative. Local 1529 took no action to reestablish its majority status during the term of the contract. Now that the contract has expired, however, the companies have "disrupted the bargaining relationship at a time when [the local's] role as bargaining representative is most vital to the employees: at the commencement of negotiations for a new collective-bargaining agreement." Id. at 398. As in Knapp, the companies "had but to question initially the merger procedures rather than recognize Local [1529]." Id. The companies are estopped from questioning the merger procedure now.
 
 
 20
 NLRB v. Canton Sign Co., 457 F.2d 832 (6th Cir.1972), is not to the contrary. In that case the predecessor union was never certified as the bargaining representative of the company's employees, and no union members worked for the company when it withdrew recognition. Id. at 839; see also Knapp, 263 N.L.R.B. at 398 n. 5.
 
 III
 
 21
 The Board determined that Sewell-Allen violated the Act by waging an anti-union campaign. The Board's findings of fact must be accepted if they are supported by substantial evidence in the record taken as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).
 
 
 22
 It is an unfair labor practice for an employer to threaten retaliation or to promise benefits based on employees' support for or opposition to the union. NLRB v. E.I. Du Pont de Nemours, 750 F.2d 524, 527-28 (6th Cir.1984). Kimbrough testified that Sewell and Allen threatened that he would be out of a job if he supported the union. Dancer testified that store manager Gordon and supervisor Phillips had him circulate a decertification petition and promised him more hours for completing the task. It is an unfair labor practice for an employer to sponsor or participate in the circulation of a decertification petition. Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1299 (6th Cir.1988). Dancer testified that he was given the petition, that he was told whose names should appear first and last, and that Gordon provided him with the address of the local NLRB office. The evidence also indicates that Sewell, Allen, Gordon, and Phillips repeatedly solicited employees to withdraw support from the union, which they ought not to have done. See Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 296 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986).
 
 
 23
 Substantial evidence also supports the Board's finding that Sewell-Allen violated §§ 8(a)(1) and (3) by discharging workers because of union activity. Such conduct clearly violates the Act. NLRB v. Price's Pic-Pac Supermarkets, Inc., 707 F.2d 236, 240 (6th Cir.1983). Unlawful motivation may be inferred from demonstrated hostility to the union, the timing of the discharges, and the implausibility of proffered reasons for them. Du Pont, 750 F.2d at 529; Grand Rapids Die Casting Corp. v. NLRB, 831 F.2d 112, 117 (6th Cir.1987). Hostility to the union can be seen in the decertification drive. The timing of the discharges, just before the decertification petition was filed, is suspicious. As for the proffered reason for the discharges, Sewell-Allen contends that it had only operated Store 103 for a short time and that it was still making adjustments. It notes that the discharges of Heist, Hordyk, and Gross occurred at the end of the fiscal year, and it cites changes in the form in which it purchased meat, which reduced the amount of meatcutting necessary. However, the Board showed that several discharges did not reduce the hours worked but merely shifted hours between employees. The evidence also showed that sales per hours worked actually decreased slightly after Heist, Hordyk, and Gross were released. There is also direct evidence of anti-union motive. Gordon boasted to Dancer that after the discharges of Heist, Hordyk, and Gross, the numbers of employees in favor of and opposed to the union were equal. The company gives no explanation for the timing of Kimbrough's discharge, except that it became apparent to them that he was no longer needed. This explanation is suspect, given that he was told several months earlier that if he supported the union he would be out on the street in January or February.
 
 IV
 
 24
 Whether Baker Brothers conducted an anti-union campaign is not quite as clear-cut. Only statements and conduct attributable to the employer may constitute an unfair labor practice. NLRB v. Schroeder, 726 F.2d 967, 970 (3d Cir.1984). The Board's finding that Baker Brothers had violated § 8(a)(1) was based for the most part not on the conduct of upper management,[2] as in the case of Sewell-Allen, but on the conduct of Baker Brothers' head meatcutters, who were members of the bargaining unit. The issue here is whether the activities of Baker Brothers' head meatcutters in interrogating employees and sponsoring a decertification drive are attributable to Baker Brothers.
 
 
 25
 We must first determine whether the head meatcutters were supervisors. The National Labor Relations Act defines a supervisor as:
 
 
 26
 "[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).
 
 
 27
 Because the definition is written in the disjunctive, an employee is a supervisor if he performs any of the listed activities, as long as the authority requires independent judgment. NLRB v. Lauren Mfg. Co., 712 F.2d 245, 247 (6th Cir.1983). The courts have also recognized secondary indicia of supervisor status, such as co-workers' perceptions that the person is a supervisor or the small amount of time devoted to the type of work performed by bargaining unit employees. Monotech of Mississippi v. NLRB, 876 F.2d 514, 517 (5th Cir.1989). Each of the three meatcutters in question meets some of these criteria. Hamm directed the work of others, interviewed applicants and effectively recommended that they be hired. He disciplined employees, he was considered by co-workers as the manager of the meat department, and he spent only a quarter of his time cutting meat. McClellan directed the work of others, assigned and approved overtime and vacations, and was considered the manager of the department by his co-workers. Westmoreland was able to discipline co-workers. The Board's determination that the head meatcutters are supervisors thus has support in the record and a reasonable basis in law. See Beverly Enterprises v. NLRB, 661 F.2d 1095, 1099 (6th Cir.1981).
 
 
 28
 Nevertheless, the conduct of the supervisors may be attributed to the employer only if "the employer encouraged, authorized, or ratified the supervisor's activities or acted in such manner as to lead employees reasonably to believe that the supervisor was acting for or on behalf of management." Montgomery Ward & Co., 115 N.L.R.B. 645, 647 (1956), enf'd, 242 F.2d 497 (2d Cir.), cert. denied, 355 U.S. 829 (1957). Accord, Connecticut Distributors, Inc. v. NLRB, 681 F.2d 127, 129 (2d Cir.1982). See also Schroeder, 726 F.2d at 971 (noting that the majority of courts of appeals addressing the issue "have predicated the employer's liability for threats by a supervisor on whether the employee hearing them would have just cause to believe that the supervisor was acting for and on behalf of the employer"); Ballou Brick Co. v. NLRB, 798 F.2d 339, 347 (8th Cir.1986).
 
 
 29
 Al Baker, by his comments to employees at each of his stores after the decertification petition was filed, ratified the head meatcutters' activities. He placed his imprimatur on the decertification drive by thanking those who signed the petition "for the confidence" they placed in him. His statement that things would run more smoothly after the matter was resolved could be taken, as the Board took it, as an implied promise of better conditions without the union despite Baker's assurance that the employees would not lose benefits regardless of the vote. Baker's questioning of one employee regarding union "harassment," based on reports he received from McClellan, also supports the inference that McClellan and the others acted with Baker's approval. Baker also admitted telling the employees that he understood an overwhelming majority of employees had signed the petition. Baker learned this from McClellan. McClellan, not surprisingly, attended the meeting at Store 81, where he was head meatcutter. McClellan's anti-union activities and the content of Baker's remarks suggest that McClellan acted with the approval of management.
 
 V
 
 30
 After this case was submitted, the petitioners filed a motion for leave to file a supplemental brief, pursuant to Rule 28(c), Fed.R.App.P., in order to discuss three recent appellate cases: Texas Petrochemicals v. NLRB, 923 F.2d 398 (5th Cir.1991); NLRB v. Mountain Country Food Store, Inc., 931 F.2d 21 (8th Cir.1991); and Emhart Industries, Hartford Division v. NLRB, 907 F.2d 372 (2d Cir.1990). These authorities do not alter our conclusion that the petitioners' defense of an invalid merger is barred and that the petitioners committed unfair labor practices.
 
 
 31
 Accordingly, the motion for leave to file a supplemental brief is DENIED, the employers' joint petition for review of the Board's order is DENIED, and the Board's cross-petition for enforcement of its order is GRANTED.
 
 
 
 [1]
 The Supreme Court has since found it permissible to exclude nonmember employees. NLRB v. Financial Institution Employees of America, Local 1182 (Seattle-First National Bank), 475 U.S. 192 (1986). In proceedings before the Board's administrative law judge the companies also claimed that other procedural defects, such as the lack of a secret ballot, invalidated the vote
 
 
 [2]
 Baker Brothers does not seriously challenge the Board's finding of an independent violation of § 8(a)(1) based on Al Baker's interrogation of employee Mayfield, and substantial evidence supports the finding