BEVERLY CALIFORNIA COR-
PORATION, Petitioner,
Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross–
Applicant.

Nos. 91–5660, 90–5856.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1992.

Decided July 29, 1992.

Andrew A. Peterson (argued), Jackson, Lewis, Schnitzler & Krupman, Thomas V. Walsh (briefed), Jackson, Lewis, Schnitzler & Krupman, White Plains, N.Y., Kathleen Achterhol, Fort Smith, Ark., for petitioner, cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein (briefed), Marilyn O'Rourke (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., Gerald Kobell, Regional Counsel, N.L.R.B. Pittsburgh, Pa., for respondent, cross-petitioner.

Before: NELSON and BOGGS, Circuit Judges; and BERTELSMAN, Chief District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a labor relations case that presents a frequently recurring question: how to apply the term "supervisor," as defined in 29 U.S.C. § 152(11), in determining eligibility for union representation.

As often happens in such cases, the individuals whose status is in question here—a group of registered nurses employed at a nursing home—had jobs that put them close to the dividing line between labor and management. The health care field is one in which the task of figuring out where the line runs has been particularly trouble-

* The Honorable William O. Bertelsman, Chief United States District Judge for the Eastern Dis- trict of Kentucky, sitting by designation.

some, and there is some tension within the caselaw in this area. See *Children's Habilitation Center, Inc. v. NLRB*, 887 F.2d 130, 134 (7th Cir.1989), contrasting *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076 (6th Cir.1987), with *NLRB v. Res–Care, Inc.*, 705 F.2d 1461 (7th Cir. 1983), and *NLRB v. American Medical Services, Inc.*, 705 F.2d 1472 (7th Cir.1983).

As to the registered nurses in the case at bar, a Regional Director of the National Labor Relations Board decided after a representation hearing that they were not statutory supervisors. Finding that the duties of the registered nurses were "generally limited to giving directions toward the quality treatment of patients," the Regional Director concluded that "such directions do not constitute supervisory authority in the Employer's interest." The nurses were therefore held to be employees eligible for placement in a collective bargaining unit.

A three-member panel of the Board denied a request for review, over the dissent of one member, and the employer was ultimately ordered to engage in collective bargaining with the nurses' union representative. The employer has petitioned for review of that order, and the Board has filed a cross-application for enforcement.

Applying the substantial evidence test, and adhering to the interpretation of 29 U.S.C. § 152(11) adopted by this court in *Beacon Light*, we conclude that the registered nurses came within the "supervisor" definition and that the Board's decision to the contrary was factually and legally unsupportable. "Where nurses otherwise meet the statutory definition of supervisors, they are not disqualified because the activity they are supervising is patient care." *Beacon Light*, 825 F.2d at 1079. We shall therefore grant the petition for

review and deny enforcement of the contested order.

I

The petitioner, Beverly California Corporation, is a renamed version of the same company that was before us in *Beverly Enterprises v. NLRB*, 661 F.2d 1095 (6th Cir.1981). One of the nursing homes it operates is Richland Manor, a long-term care facility located in Johnstown, Pennsylvania. At the time of the representation hearing, which was conducted before an NLRB hearing examiner in October of 1990, Richland Manor had 26 skilled nursing beds, 54 intermediate care beds, and space for 22 residential care patients.[1]

The person in overall charge of Richland Manor held the title of Administrator. Reporting to him were the heads of seven departments: Housekeeping/Laundry, Maintenance, Nursing, Business Office, Dietary Services, Social Services, and Activities. The record does not disclose the size of the staff of any of these departments other than Nursing.

There were, it appears, 63 people in the Nursing Department: a Director of Nursing, an Assistant Director of Nursing, 9 registered nurses[2] (the majority of whom worked only part-time), 11 licensed practical nurses, and 41 nurse's aides or nursing assistants. The licensed practical nurses (LPNs) were covered by a collective bargaining agreement at the time of the hearing, but the registered nurses (RNs), although paid on an hourly basis like the LPNs, were not.

Because of the need for around-the-clock patient care, the work of the Nursing Department was divided into three shifts. State regulations required that each shift include a registered nurse. On the day shift there were one RN, two LPNs, and 10

---

1. Effective in January of 1991, the testimony indicated, Beverly planned to add eight more skilled nursing beds and eliminate the residential unit. That unit, as the Regional Director found, was functionally distinct from the nursing home.

2. The Administrator testified that there were 10 registered nurses, but the Director of Nursing

subsequently explained that the correct number was nine. The Regional Director—who, like us, was not present at the hearing—said in his decision that there were "approximately" nine registered nurses. Nine registered nurses voted in the representation election, and the Board's brief indicates that nine is the correct number.

nurse's aides. The second shift had one RN, two LPNs for part of the shift and one for the remainder, and eight nurse's aides. The night shift had one RN, one LPN, and four nurse's aides.

The registered nurses—whose official job title was "R.N. Charge Nurse Supervisor," or, for brevity's sake, "RN Supervisor"—reported to the Director of Nursing or her assistant. The Director of Nursing was responsible for the entire facility when the Administrator was absent, and the Assistant Director of Nursing was in charge when both the Administrator and Director were absent. At times when all three were away—on weekends and during 15 or 16 hours of each weekday—the person in charge of the nursing home was the RN Supervisor. During such times, the evidence showed, the management responsibilities of the RN Supervisor extended to supervision of personnel outside the Nursing Department.

The RN Supervisor was always in direct charge of the nursing staff assigned to the skilled nursing unit, while an LPN—who reported to the RN Supervisor—had charge of the intermediate care unit. The RN Supervisor was ultimately responsible for nursing care in both units, and the evidence showed that she was expected to oversee the work of all nurse's aides and LPNs to insure that proper health care was being provided across the board. The current Director of Nursing (who worked as an RN Supervisor from 1983 through 1989) testified that the RN Supervisors did not spend more than 10 or 15 percent of their time providing direct hands-on care themselves. One part-time RN Supervisor estimated, however, that she spent approximately 50 percent of her workday providing such care.

The Assistant Director of Nursing made the primary assignment of LPNs and nurse's aides to a particular unit or wing. The RN Supervisors, in turn, had authority to call people in (according to seniority) to cover for absent employees; to transfer LPNs and nurse's aides between wings to compensate for temporary personnel shortages; to authorize and deny overtime; to excuse tardiness; and to let members of the nursing staff leave early in emergency situations. RN Supervisors could also make scheduling changes, in the absence of the Assistant Director of Nurses, when members of the nursing staff wanted to exchange workdays. The RN Supervisors resolved complaints made by non-supervisory employees, prepared absence reports, and initialed the time cards of nurse's aides to verify overtime and correct occasional errors. The RN Supervisors had certain responsibilities for on-the-job training of new people, were responsible for the security of the building, and, most importantly, were responsible for making sure that nursing staff employees were providing acceptable care to the patients and were complying with the employer's work rules.

The RN Supervisors had clear disciplinary responsibility. According to their written job description, RN Supervisors were empowered "to counsel and discipline employees and to effectively recommend disciplinary action." Richland Manor had a "progressive discipline" policy, and there was evidence that an RN Supervisor could, without prior approval, take any disciplinary step—counseling, oral warning, first written warning, final written warning or suspension—short of discharge. On one occasion two RN Supervisors recommended that the employment of a member of the nursing staff be terminated, and that recommendation was accepted.[3]

---

**3.** The paperwork on both suspensions and discharges was supposed to be signed by the Administrator as well as by the RN Supervisor, but as a practical matter the RN Supervisors seem to have been involved in few disciplinary actions more severe than "counseling" or "oral warning." Counseling was quite common, but situations requiring more stringent action appear to have been uncommon.

It is the existence of disciplinary *authority* that counts under the statute, and not the frequency of its exercise. *NLRB v. Medina County Publications, Inc.,* 735 F.2d 199, 201 (6th Cir. 1984); *Federal Compress & Warehouse Co. v. NLRB,* 398 F.2d 631, 634 (6th Cir.1968). A finding that authority to discipline exists need not be made solely because of a solitary instance where discipline has been imposed, see *Highland Superstores, Inc. v. NLRB,* 927 F.2d 918,

On another occasion, a nurse's aide committed a blunder that called for disciplinary action and the RN Supervisor on duty at the time did nothing about it. Her superiors talked to her about this, and the employer then called an in-service meeting of the RN Supervisors at which a "human resources representative" lectured them on their responsibilities in administering employee discipline.

RN Supervisors were responsible for preparing periodic written evaluations of the LPNs and nurse's aides. The main purpose of the evaluations was to identify areas where additional training might be called for and to improve the performance of the nursing staff in providing patient care.

## II

On October 2, 1990, a unit of the National Union of Hospital and Health Care Employees, Service Employees International Union, AFL–CIO, filed a petition with the National Labor Relations Board seeking certification as the representative of a bargaining unit consisting of all full-time and part-time registered nurses at Richland Manor. A representation hearing was held before a Board-appointed hearing examiner, following which the Board's Regional Director in Pittsburgh issued a decision directing that a representation election be held in a bargaining unit comprised of such nurses. Supervisors were expressly excluded from the bargaining unit, and it was agreed that the Director of Nursing and the Assistant Director belonged in the supervisor category. The Regional Director accepted the union's contention that the rest of the registered nurses at Richland Manor were non-supervisory employees.

The employer petitioned the Board for review of the decision, and review was declined by a vote of two to one. At a representation election held in December of 1990 the RNs voted seven to two in favor of the union. The employer refused to bargain, and this led to an unfair labor practice charge by the union and a complaint by the Board's General Counsel. Rejecting the employer's argument that it was not required to bargain because the members of the supposed bargaining unit were statutory supervisors, the Board issued a decision and order dated May 28, 1991, granting summary judgment in favor of the General Counsel and ordering the employer to bargain with the union on request.

The employer filed a timely petition for review by this court, and the Board filed a cross-application for enforcement of its order. The Board subsequently suggested that the case be heard en banc, citing the existence of published caselaw in which, insofar as "the issue of supervisory status in the health care field" is concerned, the Sixth Circuit "has disagreed with the Board's traditional approach." No active judge favored the en banc suggestion, and the case was assigned to the present panel. The posture of the case is such that our review is appropriately directed to the correctness of the Regional Director's bargaining unit decision. See *Beverly Enterprises*, 661 F.2d at 1098; *Waverly–Cedar Falls Health Care Center, Inc. v. NLRB*, 933 F.2d 626, 628 (8th Cir.1991).

## III

Under the Taft–Hartley amendments to the National Labor Relations Act, supervisors are not bargaining unit employees and employers cannot be compelled to negotiate with representatives of supervisors. 29 U.S.C. §§ 152(3) and 164(a); *cf. Highland Superstores, Inc. v. NLRB*, 927 F.2d 918, 920 (6th Cir.1991).

In language that has been unchanged since it was added by the Taft–Hartley Act in 1947, § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), defines the term "supervisor" thus:

"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, dis-

922 (6th Cir.1991), but that is not this case. Here the RN Supervisors had written authority to impose discipline, and they were under instructions to exercise that authority if it became necessary to do so.

charge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

■ It bears emphasis, perhaps, that "any" individual who meets the statutory tests is a supervisor; there is no exception for supervisors in the health care field.[4] In 1974 the Senate Labor Committee considered recommending enactment of legislation to create such an exception, but the idea was dropped. See S.Rep. No. 93–766, 93rd Cong., 2d Sess. 6 (1974), reprinted in (1974) U.S.Code Cong. & Admin.News 3946, 3951.

It also bears emphasis that § 2(11) uses the disjunctive "or" in listing the numerous indicia of supervisory status. *NLRB v. Medina County Publication, Inc.*, 735 F.2d 199, 200 (6th Cir.1984). Any individual who has authority in any *one* of the listed categories is a supervisor, according to the statute, as long as such authority is to be exercised "in the interest of the employer" and as long as its exercise "is not of a merely routine or clerical nature, but requires the use of independent judgment."

■ Turning to the facts of the instant case, there can be no real doubt that each RN Supervisor employed at Richland Manor had authority "responsibly to direct" and to "discipline" the LPNs and nurse's aides working under her.[5] The more problematic issues are whether the RN Supervisors exercised their authority "in the interest of the employer," and whether such exercise required "the use of independent judgment," as opposed to being "merely routine" in nature.

Sounding a theme that recurs frequently in the Board's decisions in the health care

area, the Regional Director stressed that most of the activities of the RN Supervisors "arise directly from patient care needs." With respect to the RN Supervisors' authority to direct the work of the nurse's aides, for example, the Regional Director made the following observations:

> "the direction of the nursing assistants' work by the RNs is given routinely in connection with the treatment of patients to ensure that quality care is provided to all patients in their care units. There is no evidence that the RNs' direction of employees' work goes beyond into '*personnel authority* which more directly promotes the interests of the Employer and is not motivated by patient care needs.'" (Citations omitted, emphasis supplied.)

Summing up, the Regional Director said "I am satisfied that their duties are generally limited to giving directions toward the quality treatment of patients and that such directions do not constitute supervisory authority in the Employer's interest."

An RN Supervisor who responsibly directs LPNs and nurse's aides in providing proper care to patients may or may not be exercising "personnel" authority, but "personnel" is an adjective that nowhere appears in § 2(11). Under the statute, as we read it, the question is whether the individual whose status is in question has "authority," pure and simple, responsibly to direct others in the interest of the employer—and the notion that direction given to subordinate personnel to ensure that the employer's nursing home customers receive "quality care" somehow fails to qualify as direction given "in the interest of the employer" makes very little sense to us.

The idea does, to be sure, find support in the caselaw. See, for example, *Misericordia Hospital Medical Center v. NLRB*, 623 F.2d 808, 815–18 (2d Cir.1980), and *NLRB*

---

**4.** Nurses and other professionals are not excluded from collective bargaining units merely because they are professionals, see 29 U.S.C. §§ 152(12) and 159(b)(1), but like anyone else, professionals are excluded if they are supervisors. See *NLRB v. Yeshiva University*, 444 U.S. 672, 682–83, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980).

**5.** It may be arguable that the RN Supervisors also had authority to "assign" employees and "adjust [their] grievances," but our disposition of the case makes it unnecessary for us to reach these questions.

*v. Res–Care, Inc.*, 705 F.2d 1461, 1468 (7th Cir.1983). In speaking of LPNs' discretion to "assign" nurse's aides, the *Res–Care* court observed that "this discretion is exercised in accordance with a professional judgment as to the best interests of the *patient* rather than a managerial judgment as to the *employer's* best interest." (Emphasis supplied.) See also *Waverly–Cedar Falls Health Care Center, Inc. v. NLRB*, 933 F.2d 626, 630 (8th Cir.1991), (quoting the *Res–Care* language with evident approval), *NLRB v. Walker County Medical Center, Inc.*, 722 F.2d 1535, 1542 (11th Cir.1984), and *Children's Habilitation Center, Inc. v. NLRB*, 887 F.2d 130, 134 (7th Cir.1989) ("Supervision exercised in accordance with professional rather than business norms is not supervision within the meaning of the supervisor provision...."). But see *Beverly Enterprises v. NLRB*, 661 F.2d 1095, 1103 (6th Cir. 1981), where the panel observed, somewhat wryly, that "the exercise of professional judgment in directing employees and the interest of the employer are not always mutually exclusive."

As a matter of economics, we should have thought it self-evidently in the best interest of the employer to try to do a superior job of serving the needs and interests of the employer's customers. Nursing home patients and their families often have a choice of facilities, and, other things being equal, the home that provides the best patient care would seem to have a real competitive advantage. "Patient care," after all, "is the *business* of a nursing home." *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076, 1079 (6th Cir.1987) (emphasis supplied). We are at something of a loss to understand why, in a free enterprise system, it should not be considered in the interest of a nursing home operator to provide the type of patient care likely to attract and retain nursing home patients.

Just as the supposed taint of "patient care" does not, in our view, mean that individuals who responsibly direct others in providing such care are somehow acting other than in the interest of the employer, the use of independent judgment does not

become "merely routine" when exercised in the interest of patients housed in the employer's nursing home. The Board recognized this truism in *Avon Convalescent Center, Inc.*, 200 NLRB 702 (1972), enforcement granted, 490 F.2d 1384 (6th Cir. 1974), where it said this:

> "In a nursing home servicing elderly and sick patients whose critical needs may momentarily require variations in standard procedures, the nurse responsible for the supervision of other nurses or a shift or a section must obviously be prepared to exercise her discretion in utilizing her training and experience and assign and direct employees placed under her authority more than clerically or routinely. Furthermore, power to enforce important personnel policies, rules, and regulations is certain to require the exercise of independent judgment."

It is perfectly obvious that the kind of judgment exercised by registered nurses in directing LPNs and nurse's aides in the care of patients occupying skilled and intermediate care beds in a nursing home is not "merely routine." As a matter of law, we have long since concluded, the fact that such judgment is exercised in the health care context makes no difference at all:

> "Where nurses otherwise meet the statutory definition of supervisors, they are not disqualified because the activity they are supervising is patient care. There is no support in either the text of the Taft–Hartley Act or the legislative history of that Act for such a position. Upon our reading of the statute, we think that the law means exactly what it says, that individuals who 'promote, discharge, discipline, assign, and responsibly direct employees, or recommend such action' are supervisors, whether they are employed in the health care industry or any other industry." *Beacon Light*, 825 F.2d at 1079–80 (footnote and statutory citations omitted.)

Our earlier decision in *Beverly Enterprises*, 661 F.2d 1095, is not to the contrary. In that case a Regional Director of the Board had invoked the "patient care" doctrine in holding that seven LPNs em-

ployed at a nursing home were not statutory supervisors. We quoted from the Regional Director's decision as follows:

" * * * [T]he LPNs here make assignments of work, report infractions, write evaluations, in conjunction with their patient care responsibilities. On balance, I find the LPNs' duties to be primarily those concerned with patient care and their actions to be taken pursuant to that care, and not as the product of independent judgment." 661 F.2d at 1101.

After denying a request for review of the Regional Director's decision, the Board issued an order directing Beverly to bargain with the representatives of a unit that included LPNs.

When the case came before a panel of this court on a petition for review and cross-application for enforcement, we declined to grant enforcement.[6] Referring to the passage quoted above from the Regional Director's decision—a passage that could just as well have come from the decision issued by the Regional Director in the case at bar—we said in *Beverly* that although we had a substantial degree of difficulty in understanding exactly what the Regional Director meant, *id.* at 1101, we thought that the passage's "tenor and possible intended meaning reflect a basic misunderstanding or misapplication of the 'Congressional directive' " that the Board had discerned in what the Senate Labor Committee said in its 1974 recommendation against amending § 2(11).[7] Under the plain meaning of the statute, as we went on to explain, a decision that the LPNs were not supervisors would have to be based on either a finding that they did not exercise independent judgment in their assignment and direction of aides and orderlies or a finding that the LPNs' exercise of independent judgment was not in the interest of the employer; such a decision could not be based simply on a finding that "their supervisory activities in assigning and directing subordinate employees were 'in conjunction with their patient care responsibilities.' " *Id.*

Despite the fact that it was unwilling to disturb many of the Regional Director's findings with respect to the § 2(11) criteria, the *Beverly* panel was unable to conclude that the determination to include LPNs in the bargaining unit had a reasonable basis in law. The panel therefore remanded the case with specific instructions that the matter be reconsidered by the Regional Director. *Id.* at 1104–05.

The subsequent history of *Beverly* sheds little light on our present problem. The Board reaffirmed its original decision without referring the cause to the Regional Director, and the employer again filed a petition for review. Again we remanded the case, expressing ourselves as "greatly concerned" at the Board's disregard of the

---

6. Erroneously grouping *Beverly* with cases "upholding the Board's certification of a nurses' collective bargaining unit," the Seventh Circuit has read *Beverly* as a case "where the Board's order was enforced." *NLRB v. American Medical Services, Inc.,* 705 F.2d 1472, 1474–75 (7th Cir.1983); *NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1468 (7th Cir.1983). Even Homer nodded, it is said.

7. The committee report in question said that the Board had "carefully avoided applying the definition of 'supervisor' to a health care professional who gave direction to other employees in the exercise of professional judgment, which direction is incidental to the professional's treatment of patients, and thus is not the exercise of supervisory authority in the interest of the employer." The report added that "[t]he Committee expects the Board to continue evaluating the facts of each case in this manner when making its determinations." S.Rep. No. 93–766, 93

Cong., 2d Sess. 6 (1974), reprinted in (1974) U.S.Code Cong. & Admin.News 3946, 3951.

This endorsement of pre–1974 NLRB decisional law came from the Senate Labor Committee, of course, and not from Congress as a whole. But see *NLRB v. Yeshiva University,* 444 U.S. 672, 690 n. 30, 100 S.Ct. 856, 866 n. 30, where the Supreme Court characterized the committee report as approval by "Congress." Given the requirements of Article I, § 7 of the Constitution, we do not think it would be prudent to read too much into footnote 30 of *Yeshiva University*—a case in which, after all, the Supreme Court *rejected* an NLRB legal interpretation similar to the one at issue here. Footnote 30 does not persuade us that the Supreme Court would be likely to hold that a report issued by a single Congressional committee in 1974—a report not passed by either house and not presented to the President—could somehow alter the meaning of a statute enacted by a two-thirds vote of each house of Congress in 1947.

original remand order. Quoting from *Kitchen Fresh, Inc. v. NLRB,* 716 F.2d 351, 357 n. 12 (6th Cir.1983), we reminded the Board that it is the courts, not the Board, that "bear the final responsibility for interpreting the labor laws." *Beverly Enterprises v. NLRB,* 727 F.2d 591, 592 (6th Cir.1984).

The *Beverly* case was finally sent back to the Regional Director, and he made additional findings and conclusions supporting the decision that the LPNs were not supervisors. The Board affirmed the Regional Director's rulings in a second supplemental decision and order, 275 NLRB 943 (1985), issued shortly after control of the nursing home was transferred to another corporation. See *Petoskey Geriatric Village, Inc.,* 295 NLRB 800 (1989). Review of the second supplemental decision and order was not sought in this court. In view of our subsequent decision in *Beacon Light,* however, and given what the Seventh Circuit has described as "judicial impatience with the Board's well-attested manipulativeness in the interpretation of the statutory test for 'supervisor,'" *Children's Habilitation Center, Inc.,* 887 F.2d at 132, it is clear that an application for enforcement of the Board's final order would not have been granted without very careful scrutiny indeed.

Litigation such as that now before us tends to be "highly fact-bound." *Res–Care,* 705 F.2d at 1468. The validity of this observation is borne out by a comparison of *Res–Care* itself, where the Seventh Circuit granted enforcement of a Board order based on a determination that seven LPNs employed by a nursing home did not have the status of supervisors, with the companion case of *NLRB v. American Medical Services, Inc.,* 705 F.2d 1472 (7th Cir.1983), where the court denied enforcement of a Board order involving 17 RNs

employed at another nursing home. The most salient factual difference between the two cases had to do with the ratio of supervisors to non-supervisory employees—and that ratio, the Seventh Circuit has said, is one of the "guiding lights" in this kind of case. *Children's Habilitation Center,* 887 F.2d at 132.

The nursing home in *Res–Care* had a total of only 52 employees, 6 of whom (including 2 RNs) were concededly supervisors. The ratio of supervisors to non-supervisory employees was almost 1 to 8 under the Board's view, whereas the ratio would be 1 to 3 if the employer's view prevailed. As far as the nursing staff alone was concerned, the ratio was 1 to 11 under the Board's view and 1 to less than 2 under the employer's view.

In *American Medical Services,* by contrast, the nursing staff had a total of 165 employees, of whom 6 (all RNs) were concededly supervisors. Under the Board's view, the ratio of supervisors to non-supervisory employees was approximately 1 to 27; under the employer's view, approximately 1 to 6.

A 1–to–6 ratio of supervisors to non-supervisory employees is not remarkable; a ratio of only 1 to 27, on the other hand, "raises a warning flag." *American Medical Services,* 705 F.2d at 1473. Just such a warning flag appears in the case at bar—for if the Board's view were to prevail here, the ratio of supervisors to non-supervisory employees in the Nursing Department would be 1 to 31, approximately.[8]

To classify 25 percent or more of the total employees of a nursing home as statutory supervisors, which is what the employer wanted to do in *Res–Care,* would make the ranks of the supervisors pretty populous. But to classify fewer than 4 percent of the members of a nursing staff as super-

---

**8.** The Regional Director thought that the ratio would be 1 to 10—a more readily defensible proportion—but this calculation (which was based on the fact that only 29 members of the Nursing Department plus the Administrator would be on duty during a 24–hour period) was clearly erroneous. Collective bargaining units are not confined to a particular shift or a particular 24–hour period, and the relevant figures are the *total* number of Nursing Department supervisors (2 under the Board's theory, unless the Administrator is also assigned to the Nursing Department) and the *total* number of non-supervisory personnel (61 people if the RN Supervisors are treated as bargaining unit employees). See *Children's Habilitation Center,* 887 F.2d at 132, where the correct methodology is described.

visors, which is what the Board wanted to do in *American Medical Services*, would be "thinning the company's supervisory ranks unduly." *Children's Habilitation Center*, 887 F.2d at 132. With the Nursing Department ratio urged by the Board in the case at bar (2 supervisors—the Director of Nursing and her assistant—to 61 others), supervisors would constitute only slightly more than 3 percent of the total department. That is simply no way to run a business of this type.[9]

Among the purposes of the legislation that placed supervisors outside the coverage of the National Labor Relations Act were the restoration of a reasonable balance of power between employers and unions and avoidance of the conflicts of interest that may arise if an individual directing the work of union members on the job is herself a union member. See *Children's Habilitation Center*, 887 F.2d at 131–32. These purposes would be ill-served by the application of § 2(11) urged by the Board—a consideration that strengthens us in our conclusion that we ought to read § 2(11) as meaning "exactly what it says." *Beacon Light*, 825 F.2d at 1079. If Congress decides that it would be appropriate to say something different with respect to professionals in the health care field or elsewhere, Congress always has the option of amending the statute.

The petition for review is GRANTED, the Board's order of May 28, 1991, is VACATED, and the cross-application for enforcement is DENIED.

---

9. The Director of Nursing testified that in her judgment it would not be possible to manage the entire nursing function at Richland Manor with only two supervisors.

On weekends and throughout every night, if the Board had its way, Richland Manor would be providing patient care with no on-site supervision at all. As we said of a similar situation in *Beacon Light*, 825 F.2d at 1080, "[t]his is not a reasonable conclusion for a well-run nursing home, and there is no substantial evidence to support it."