**INTEGRATED HEALTH SERVICES OF MICHIGAN, AT RIVERBEND, INC., Petitioner/Cross–Respondent,**

**Teamsters Local 332 (97–6034), Intervenor,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

**Nos. 97–6034, 97–6109.**

United States Court of Appeals, Sixth Circuit.

Argued: Nov. 6, 1998.

Decided and Filed: Sept. 17, 1999.

---

Brad A. Rayle (argued and briefed), Howard & Howard, Bloomfield Hills, Michigan, for Petitioner/Cross–Respondent.

Wayne A. Rudell (briefed), Rudell & O'Neill, Dearborn, Michigan, for Intervenor.

Anne Marie Lofaso (argued and briefed), Aileen A. Armstrong (briefed), National Labor Relations Board, Appellate Court Branch, Margaret Ann Gaines (briefed), National Labor Relations Board, Washington, D.C., for Respondent/Cross–Petitioner.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. NATHANIEL R. JONES, J. (pp. 712–13), delivered a separate opinion concurring in the judgment.

## OPINION

RYAN, Circuit Judge.

Once again, in a case involving nurses, the National Labor Relations Board has refused to apply § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), as this court has interpreted it; and so, once again, we deny their petition for enforcement. And again, contrary to our previous cases, the Board has assigned the burden of proving supervisory status to the employer; and so, once again, we instruct the Board to follow our precedent. We conclude that the nurses employed by the petitioner, Riverbend, are supervisors within the meaning of § 2(11), and, again, we admonish the Board for its unremitting refusal to follow the law as we have declared it.

## I.

Riverbend is a 157–bed facility that provides "subacute" nursing care in Grand Blanc, Michigan. There are 83 beds for patients in long-term care and 74 for patients making a transition between hospital care and going home. There are five separate "nursing care units," two of which provide care to elderly patients and three of which provide care to patients of all ages in the Medical Specialty Unit (MSU). The MSU is designed to care for more complex, or "acute" patients, who require rehabilitation, life support, or other medically complex care.

Local 332, International Brotherhood of Teamsters, AFL–CIO, intervenor in this case, sought to organize and represent approximately 50 full and part-time Registered Nurses (RNs) and Licensed Practical Nurses (LPNs) employed at Riverbend. The unit for which the union petitioned includes the RNs and LPNs, collectively referred to as "staff nurses." But, the parties agree, it does not include the following: the Director of Nursing (DON), the Assistant Director of Nursing, the Clinical Coordinator, the Minimum Data Set Coordinator (MDS), the Restoration Coordinator, the Staff Development Coordinator, the Assistant MDS Coordinator, or the Wound Care Coordinator. The DON reports directly to the facility's executive director, while the other seven administrators report directly to the DON. In addition to the administrators, and RNs and LPNs, Riverbend employs approximately 40 to 50

competency evaluated nursing assistants (CENAs).

The facility operates on three eight-hour shifts: 7 a.m. to 3 p.m., 3 p.m. to 11 p.m., and 11 p.m. to 7 a.m. The nurses and the CENAs are trained to work on any of the shifts and in any of the units. On weekdays, between the hours of 7 a.m. and 4-to-5 p.m., the administrative personnel are present, as well as a first shift "charge nurse" who oversees the three units that make up the MSU. During the second and third shifts on weekdays, after administrative personnel depart, a second or third shift "house supervisor" is present. On weekends, the administration is not present, and each shift is overseen by the first shift charge nurse or the second or third shift house supervisor. The charge nurse or house supervisor acts as the highest ranking nurse and manger during his or her shift. When the regular charge nurse or house supervisor is not present, "first alternates" frequently substitute, while "second alternates" infrequently substitute. The parties stipulated below that the first shift charge nurse, second shift house supervisor, and third shift house supervisor were "supervisors" for the purposes of § 2(11). Thus, the dispute here is confined to the status of the staff nurses, including those who frequently or infrequently substitute for the charge nurse or house supervisor.

After a hearing on the union's petition to represent the nurses, the Regional Director for NLRB Region 7 issued a Decision and Direction of Election in which he found that the staff nurses were not supervisors under § 2(11) and ordered an election. The Board denied Riverbend's petition for review as it related to the Regional Director's decision that the staff nurses were not supervisors. After the election, which the union won, the Regional Director certified the union as the exclusive collective bargaining representative of the requested unit of nurses. The Board denied Riverbend's request for review of that decision, and Riverbend subsequently re-fused to bargain with the union, resulting in an unfair labor practice charge before the NLRB. In response to the Regional Director's complaint, the Board issued a decision and order finding the refusal to bargain unlawful and granting summary judgment against Riverbend. The Board did not address the supervisory status issue because it had been litigated in the representation proceeding. Riverbend brought a petition to review and set aside the Board's judgment and the Board petitioned for enforcement of its bargaining order. For the reasons that follow, we deny the petition for enforcement and hold that the Riverbend staff nurses are supervisors within the meaning of § 2(11).

## II.

■ We review the Board's legal conclusions *de novo* and its factual findings to determine whether they are supported by substantial evidence on the entire record. *See NLRB v. Good Shepherd Home, Inc.*, 145 F.3d 814, 816 (6th Cir.1998); *Grancare, Inc. v. NLRB*, 137 F.3d 372, 375 (6th Cir.1998).

## III.

Riverbend contends that, given the relationship between the staff nurses and the CENAs, the staff nurses are supervisors and, therefore, exempt from the collective bargaining unit under 29 U.S.C. § 152(11). The Board and the union contend that the decision below is legally correct and supported by substantial evidence. We conclude that the Board's decision is not supported by substantial evidence and that the Board's understanding of the governing law is mistaken.

## A.

■ The NLRA applies to "employees," as defined in 29 U.S.C. § 152(3); *see, e.g.*, 29 U.S.C. §§ 157, 158. Individuals employed as supervisors are specifically excluded from the definition of employee.

*See id.* The NLRA defines "supervisor" as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Thus, an employee is a supervisor if he (1) has the authority to engage in any one of the activities enumerated in § 2(11), (2) uses independent judgment in that activity, and (3) does so in the interest of the employer. *See Grancare*, 137 F.3d at 375; *Manor West, Inc. v. NLRB*, 60 F.3d 1195, 1197 (6th Cir.1995); *Health Care & Retirement Corp. of Am. v. NLRB*, 987 F.2d 1256, 1261 (6th Cir.1993), *aff'd*, 511 U.S. 571, 573–74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). The inquiry into supervisory status is "fact-intensive"; however, we have been forced to admonish the Board in several cases for its defiant insistence on its "unique" misapprehension of the manner in which § 2(11) applies to nurses. *Caremore, Inc. v. NLRB*, 129 F.3d 365, 371 (6th Cir.1997).

▪ We have also repeatedly explained that "[t]he Board has the burden of proving that employees are not supervisors." *Grancare*, 137 F.3d at 375. Yet, in this case, as in many others, the Board endorsed the statement that "[a] party seeking to exclude an individual as a supervisor has the burden of establishing such status." Because we have indicated in *Grancare*, 137 F.3d 372; *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076, 1080 (6th Cir.1987), and elsewhere that employers do not bear this burden, the Board's analysis in this case rests upon a false legal premise. Indeed, the Regional Director's decision concluded that the RN and LPN staff nurses are eligible to vote in the election because *"the Employer has not sustained its burden* of establishing that the staff nurses possess supervisory authority within the meaning of the Act." (Emphasis added.) Thus, we find ourselves in a difficult position when faced with the task of reviewing the Board's decisions in these cases because, as a threshold matter, the Board views the relative strengths and weaknesses of the evidence from an entirely wrongheaded perspective. On this basis alone, the Board's petition for enforcement is subject to denial. Nevertheless, noting the proper burden, and the Board's recalcitrant failure to observe it, we proceed to an analysis of whether the Board erred in deciding that the staff nurses in this particular case were supervisors under § 2(11).

**B.**

We agree with the Board that the staff nurses do not have independent authority to hire, discharge, transfer, promote, demote, lay off, recall, reward, or suspend the CENAs. However, the Board also concluded that the staff nurses' alleged responsibility to independently schedule, assign, and direct the CENAs' work is not supervisory because it is of a *merely routine or clerical nature*, and, thus, requires *no more judgment than garnered by the nurses' experience or training as nurses.* In other words, the Board determined that certain conduct of the staff nurses described by Riverbend as supervisory did not involve independent judgment because the conduct is simply part and parcel of what it means to be a nurse in a facility such as Riverbend. On this point, we disagree with the Board's conclusions as a matter of law. However, we turn first to the issue whether the Board's decision is supported by substantial evidence.

**1.**

▪ With respect to scheduling, assignment, and direction, the Board found that the role of the scheduling coordinator and the DON, in creating the CENAs' schedules, rendered subsequent alteration by

the staff nurses in response to the needs of a given unit on a given day patterned, routine, and not requiring any independent judgment on the nurses' part because the decisions merely depended on "patient census [and] workload needs," which are matters within a nurse's experience and training. It also found that there was no evidence that the staff nurses' role with respect to overseeing CENA work-breaks and lunches required independent judgment. With respect to discipline of the CENAs, the Board found that the staff nurses' role did not amount to supervisory status because there was no evidence that the nurses performed any role beyond that of merely witnessing misconduct and reporting it in a manner that did not inevitably lead to disciplinary action, given the prescribed contractual procedures for formal discipline found in the CENAs' collective bargaining agreement.

We hold that the Board's determinations on each of these questions is not supported by substantial evidence on the whole record. The record is replete with examples of uncontradicted testimony explicitly describing the staff nurses' supervisory role in scheduling, assigning, and delegating work, as well as providing on-the-spot disciplinary action when required by the circumstances.

> [W]e will not give a factual finding "more weight than in reason and in the light of judicial experience [it] deserve[s]." ... If the record reveals that the administrative law judge has ignored uncontradicted testimony or otherwise abused his discretion in resolving factual issues, this court must not acquiesce in the decision. Indeed, the "substantial evidence" doctrine requires that we consider the entire record, including those portions which fairly undermine the administrative law judge's ultimate conclusions.... Although we are not permitted to substitute our judgment for that of the administrative law judge when credibility findings are involved, ... no such deference is mandated where a[n] administrative law judge's factual findings are unreasonable in light of the evidence and testimony presented below.

*Hickman Harbor Serv. v. NLRB*, 739 F.2d 214, 218–19 (6th Cir.1984) (citations omitted).

At the hearing, Katherine Merwin, the DON, repeatedly testified that the staff nurses are the CENAs' "first line supervisor[s]" with respect to scheduling, work assignments, authorization for breaks and lunches, and certain disciplinary actions. Specifically, she testified that the schedules or "shift assignments" provided to the staff nurses on each unit on a daily basis are "the tool that the nurses use ... to assign their CENA staff, lunch breaks, their 15 minute breaks, what group of patients they may have, [and] any special tasks that need to be assigned." In carrying out this process, the nurses consider various factors, including the number of patients, the number of available CENAs, how the work may be equitably divided among the CENAs, the acuity of the patients, and "any other extenuating circumstance that might be coming up during the shift."

Similarly, with respect to scheduling breaks, the DON specifically testified that the CENAs must obtain "the permission of their staff nurse, their first line supervisor," if they want to take a break at a time other than their scheduled break time. Further, the DON testified that, although the CENAs are generally authorized to leave the facility during lunch only if they are punched out, a CENA could leave the facility while still punched in, if she had the permission of her staff nurse to leave for an emergency; and, a staff nurse could deny such permission. The DON also testified quite clearly that staff nurses have often recommended transfer of certain CENAs, and that action had been taken on the basis of such recommendations. Further, she testified unequivocally that the staff nurses had the authority to discipline the CENAs for failing to comply with the staff nurses' directions or with patient

needs, and that she reminds the staff nurses of this authority at monthly meetings with the staff nurses. Indeed, such authority involves the exercise of *discretion* by the staff nurses in that they may address failure to comply with directions or insubordination with any disciplinary measure from verbally counseling the CENA regarding proper procedure "up and through informing the employee to punch out and go home." The staff nurses also have the authority to "write up" CENA misconduct in order to document it for further disciplinary action.

Consistent with this testimony, staff nurse Jan Walton testified that the staff nurses have been in a supervisory position over the CENAs since her hiring over eight years before her testimony. She testified that her job required that she determine each day what extra duties would be required of the CENAs for that particular day and assign the duties to the CENAs accordingly "because every day is different on the unit." Moreover, although the CENAs' work schedules are generally determined by a rotation system, the staff nurse may need to adjust the rotation in order to satisfy the needs of a particular patient or other unique circumstance presented that day. Where adjustments are required, the staff nurse makes the final decision as to where a CENA will work that day. Nurse Walton also confirmed that the staff nurses determine when the CENAs will take breaks and that the breaks are scheduled routinely during designated times to avoid short staffing the unit. However, where unique circumstances may require that a CENA miss a break, the staff nurse determines whether the break will be missed, and when the break will be rescheduled.

Nurse Walton also testified that the staff nurses have the authority to authorize CENAs to leave early if the circumstances warrant it. This requires the nurse to consider the staffing for the unit for that particular day, each resident's status and needs for the day, and whether anyone else is leaving early that day. The nurse may deny a CENA permission to leave early, and nurse Walton has denied such permission on more than one occasion. The staff nurses also may call CENAs in to work in a short-staff situation, although they do not have the authority to require the CENAs to report to work.

With respect to disciplinary authority over the CENAs, nurse Walton testified that she has the authority to require a CENA to punch out and leave the premises for insubordination, abusive language, or improper treatment of a family member, and that she has exercised that authority. Staff nurses also have the authority to document CENA misconduct for the purpose of further disciplinary action by the DON; but, the staff nurse is not required to document every incident of misconduct. Instead, according to nurse Walton's testimony, the staff nurse may consider items such as "the severity of the action," "the risk . . . to the resident," and "the risk . . . to the unit as a whole, and to the facility," in judging for herself whether and to what extent disciplinary action from verbal counseling to sending the CENA home and/or writing her up is necessary.

Likewise staff nurse Jo Anna Brown testified that she has the authority to order a CENA to punch out and leave for insubordination. Additionally, she has exercised this authority in response to CENA Sharon Miller's insubordination and use of foul language. Significantly, although the house supervisor refused to support the order when nurse Brown ordered CENA Miller to punch out and leave until further notice, the DON confirmed by telephone that the CENA had to leave until further notice pursuant to the staff nurse's order. She also exercised the authority to document misconduct for further disciplinary action, and CENA Miller was ultimately terminated. Nurse Brown also corroborated the testimony of nurse Walton and the DON with respect to the

scheduling responsibilities and various considerations involved therein.

Finally, other documentary evidence in the record confirms that the nurses' job descriptions reference "functional supervision in specific situations over unit personnel," and that the nurses are evaluated for their leadership abilities in multiple areas, including equitable care assignments, staffing needs, assistance to families, and problem solving, as well as for their level of professionalism in making decisions that reflect knowledge and good judgment. The documentary evidence also reveals the staff nurses' authority to document disciplinary violations, and that such documentation has resulted in disciplinary action.

Nothing in the record contradicts the testimony of the DON and staff nurses Walton and Brown as to the staff nurses' responsible direction of the CENAs and their disciplinary authority. The Regional Director and the Board apparently chose to ignore this evidence or to view it in such a way as to distort its significance. Having carefully reviewed the testimony and other evidence on which the Regional Director and the Board relied, we conclude that the Board's decision is not supported by substantial evidence on the whole record. The evidence summarized above thoroughly undermines the Regional Director's conclusion that the nurses are not supervisors. The Riverbend staff nurses do possess authority in one or more of the areas set forth in § 2(11).

We find that the staff nurses' role in assigning the CENAs work and adjusting the schedule when necessary, *including* calling CENAs in to work, on the basis of the requirements of a given day, is sufficient to rebut an allegation of nonsupervisory status under § 2(11). In *Health Care & Retirement Corp.*, 987 F.2d 1256, a case with obvious similarities to this case, we explained:

> It appears that the staff nurses are indeed supervisors within the definition of § 2(11). Among a staff nurse's functions are the authority to assign the nurses aides and to responsibly direct them. The Director of Nursing assigns each aide to a certain shift. Once assigned to a shift, the staff nurse in charge is responsible for assigning each aide to a particular patient. Each aide assignment is based primarily upon the needs of the patients, but also with an attempt to rotate the aides' assignments. When aides do not report to work or leave work early, it is the staff nurse's responsibility to attempt to find a replacement. A staff nurse has the authority to offer other aides the option of working overtime to fill such vacancies. Although it is the staff nurse's responsibility to find a replacement, the staff nurse has the discretion to determine how he/she will accomplish his/her duties. A staff nurse may also assign and/or approve breaks and lunches.

*Id.* at 1261 (footnote omitted). Thus, we concluded that these nurses' duties "require[d] the use of independent judgment and [were] taken in the interests of the employer," and the nurses were "considered supervisors . . . and, thus, outside the coverage of the . . . Act." *Id.* As in *Health Care & Retirement Corp.*, given the evidence in this case regarding the nurses' substantially similar duties relative to scheduling, calling in replacements, assignment, and approval of breaks and leaving early, the Board, in finding that the nurses are not supervisors, "failed to meet its burden of providing substantial evidence of non-supervisory status." *Id.* The staff nurses are *required* to exercise independent judgment in assigning and scheduling the CENAs, and in approving breaks, because these decisions can only be made on the basis of the changing needs of the patients or residents, or according to whatever other unique circumstances present themselves.

 The evidence regarding the nurses' disciplinary authority further indicates the Board's failure to sustain its burden of proof. Although the Regional Director refused to conclude that the staff nurses'

disciplinary authority was supervisory because "adverse action does not inevitably result from the reprimands or warnings," the Act " 'does not preclude supervisory status simply because the recommendation is subject to a superior's investigation,' " *Caremore*, 129 F.3d at 370 (citation omitted). Moreover, we are, frankly, at a loss to understand how the Board could reasonably conclude that the staff nurses do not exercise independent judgment over disciplinary matters involving the CENAs when the staff nurse is authorized to determine whether and to what extent a CENA should be disciplined for insubordination or failure to respond to patient needs and, if the staff nurse determines it is necessary, to require the CENA to punch out and leave the premises. Presumably, such discretion would be more limited during the hours when the administrative personnel were present; however, "[i]t is the existence of disciplinary authority that counts under the statute, and not the frequency of its exercise." *Beverly California Corp. v. NLRB*, 970 F.2d 1548, 1550 n. 3 (6th Cir.1992).

We hold that substantial evidence does not support the Board's decision, because the staff nurses have the authority to responsibly direct the CENAs, and the authority to discipline them. The Board failed to meet its burden of proving otherwise.

### 2.

■ More fundamentally, the Board erred as a matter of law when it endorsed the view that the evidence regarding the nurses' scheduling, assignment, and break approval duties was insufficient because it simply flowed from the nurses' professional knowledge and training. The Regional Director emphasized that the nurses' care assignments and scheduling functions are insufficient to indicate supervisory status because they are "essentially routine in nature, and not requiring the exercise of independent judgment" and "require no more judgment than garnered by the nurs-

es' experience and training." However, we have already spoken directly to the issue whether this type of conduct is sufficient in the nursing context to show supervisory status:

> It is perfectly obvious that the kind of judgment exercised by registered nurses in directing … nurse's aides in the care of patients occupying skilled and intermediate care beds in a nursing home is not "merely routine."

*Id.* at 1553. Similarly, in *Health Care & Retirement Corp.*, 987 F.2d at 1261, we held that responsibility for assigning work to nursing assistants and approving breaks and lunches "require[d] the use of independent judgment," and in *Caremore*, 129 F.3d at 369 (citation omitted), we held that scheduling, assignment, and call-in "duties indicate … authority to 'assign' and 'responsibly to direct' the work of aides."

■ As we have observed, we will not allow the Board to decide these cases on the basis of "razor-thin factual distinctions … [that] requir[e] employers in the health-care field to bear the expense of proving, in each individual case, that their nurses are supervisors within the meaning of the NLRA." *Id.* at 371. In earlier cases, the Board has contended that the nurses were not supervisors because their duties were performed not in the employer's interest, but in the interest of patient care. We rejected that contention in *Health Care and Retirement Corp.*, and the Supreme Court agreed, explaining:

> The Board has created a false dichotomy—between acts taken in connection with patient care and acts taken in the interest of the employer.... Since patient care is a nursing home's business, it follows that attending to the needs of patients, who are the employer's customers, is in the employer's interest.

*NLRB v. Health Care and Retirement Corp.*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586. In our judgment, the Board has altered its reasoning only slightly in this case, relying on the same false dichotomy, in contending that a nurse's supervi-

sory acts are merely routine and do not involve independent judgment where the acts are informed by the nurse's training and experience as a nurse.

On similar facts, in *Beacon Light*, 825 F.2d at 1079–80, we stated:

> Contrary to the assertions of the Board, nurses with this kind of responsibility are not disqualified from being supervisors simply because their duties largely involve "mere patient care". Patient care (or "mere patient care," in the Board's phraseology) is the business of a nursing home. Where nurses otherwise meet the statutory definition of supervisors, they are not disqualified because the activity they are supervising is patient care.... Upon our reading of the statute, we think that the law means exactly what it says, that individuals who "promote, discharge, discipline, assign, [or] responsibly direct employees, or recommend such action" are supervisors, whether they are employed in the health care industry or any other industry.

(Footnote and citation omitted.) The staff nurses' conduct in relationship to the CENAs is not a matter of mere routine. Rather, in assessing how work will be assigned, the sufficiency of the day's schedule and how it will be implemented, as well as the appropriateness of breaks for rest or lunch, the staff nurses are required to assess the needs of the unit as a whole and the needs of each individual patient or resident. Because the staff nurses must exercise their independent judgment on the basis of their medical training and experience in order to effectively oversee the CENAs and to ensure the patients receive adequate care, the conclusion is inescapable that the staff nurses supervise the CENAs.

As we have stated before:

> [I]t is up to Congress to carve out an exception for the health care field, including nurses, should Congress not wish for such nurses to be considered supervisors. It is the responsibility of this Court to interpret the law as written by Congress and promulgated through case decisions. Although the Board has maintained it will not yield this point, when the facts so warrant, as in the case at bar, this court must reverse the decision of the Board.

*Health Care & Retirement Corp.*, 987 F.2d at 1261; *see also Beverly California Corp.*, 970 F.2d at 1556; *Beacon Light*, 825 F.2d at 1080.

### IV.

We **GRANT** the petition for review, **DENY** the petition for enforcement, and **VACATE** the Board's order finding that Riverbend unlawfully refused to bargain with the union.

NATHANIEL R. JONES, Circuit Judge, concurring in the judgment.

Judge Ryan has written an eloquent opinion that follows the controlling Sixth Circuit precedents, and I have no quarrel with his application of our precedents to the facts of this case. Because I am bound to follow the decisions cited in Judge Ryan's opinion, I concur in the result he reaches. *See Turker v. Ohio Dept. of Rehabilitation & Corrections*, 157 F.3d 453, 460 (6th Cir.1998). I write separately only to wonder whether it might be timely for us to follow the lead of other circuits and take a fresh look at the issues presented in this case while sitting en banc. *See, e.g., NLRB v. Grancare, Inc.*, 170 F.3d 662 (7th Cir.1999) (en banc); *Beverly Enterprises, Va., Inc. v. NLRB*, 165 F.3d 290, 297–99 (4th Cir.1999) (en banc).

Judge Ryan properly states that the "inquiry into supervisory status is 'fact-intensive.'" *Ante* at 707; *accord Grancare, Inc. v. NLRB*, 137 F.3d 372, 376–77 (6th Cir.1998) (Jones, J., concurring). But since we first considered, in 1981, the issue of whether charge nurses such as those in this case may unionize, *Beverly Enterprises v. NLRB*, 661 F.2d 1095 (6th Cir.1981), we have without exception struck down

nurses' efforts to bargain collectively with their employers in facilities such as the one in the case sub judice. *See Mid-America Care Found. v. NLRB*, 148 F.3d 638 (6th Cir.1998); *Grancare*, 137 F.3d 372; *Caremore, Inc. v. NLRB*, 129 F.3d 365 (6th Cir.1997); *Manor W., Inc. v. NLRB*, 60 F.3d 1195 (6th Cir.1995); *Health Care & Retirement Corp. of Am. v. NLRB*, 987 F.2d 1256 (6th Cir.1993), *aff'd*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); *Beverly Cal. Corp. v. NLRB*, 970 F.2d 1548 (6th Cir.1992); *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076 (6th Cir.1987).

In each of these cases, and in today's case, we have rejected the Board's arguments that nurses' oversight of aides' daily work tasks are not "routine," but rather are indicia of supervisory status. However, by faithfully adhering to these precedents, today we reach the highly questionable result that slightly fewer than 40 full and part-time registered nurses are the "supervisors" of some 40 to 50 aides. Indeed, DON Merwin did not dispute that at Integrated's facility, the ratio for staff nurses to aides on most shifts was typically 1:1 or 1:2. J.A. at 370–71. Other courts have rightfully refused to find supervisory status based on such a low supervisor to worker ratio in nursing home labor cases. *See, e.g., NLRB v. Hilliard Dev. Corp.*, 187 F.3d 133 (1st Cir.1999) (17 charge nurses were not supervisors to 30 aides); *Grancare*, 170 F.3d at 667 (ratio of 59 "supervisors" to 90 aides results in a "top-heavy setup that we think would be bizarre to say the least"); *Beverly Enterprises v. NLRB*, 148 F.3d 1042, 1047–48 (8th Cir. 1998) (low ratios support finding that nurses were not supervisors).

I fear that we have become so entrenched in our disagreements with the Board regarding the construction of § 2(11) that, as a practical matter, we have made it impossible for nurses to form collective bargaining units at nursing homes. One member of this court has already expressed her dissatisfaction with our approach to nursing home labor cases. *See Grancare*, 137 F.3d at 377–86 (Moore, J., concurring in the judgment). While circuits are badly split on the Board's interpretation of § 2(11) as applied to staff nurses in nursing homes, ours is the definite minority position. *Compare NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154, 161–69 (3d Cir.1999) (staff nurses are supervisors); *Beverly Enterprises, Va.*, 165 F.3d at 297–99 (same) *with Hilliard Dev. Corp.*, 187 F.3d 133 (staff nurses are not supervisors); *Grancare*, 170 F.3d at 667–68 (same); *Beverly Enterprises–Mass., Inc. v. NLRB*, 165 F.3d 960, 963–64 (D.C.Cir. 1999) (same); *Beverly Enterprises*, 148 F.3d at 1046–48 (same); *Providence Alaska Med. Ctr. v. NLRB*, 121 F.3d 548, 551–55 (9th Cir.1997) (same). Moreover, it appears that we are the only circuit that requires the Board to prove that employees are not supervisors. *See Beverly Enterprises–Mass.*, 165 F.3d at 962 ("burden of proving supervisory status rests upon the party asserting it"); *New York Univ. Med. Ctr. v. NLRB*, 156 F.3d 405, 412–13 (2d Cir.1998) (rejecting Sixth Circuit approach); *Schnuck Markets v. NLRB*, 961 F.2d 700, 703 (8th Cir.1992); *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1445 (9th Cir.1991); *see also Grancare*, 137 F.3d at 378–80 (Moore, J., concurring in the judgment) (criticizing practice of placing burden on the Board).

The issues presented in this case are not going to disappear. The nursing home industry is booming, and courts have recognized the societal significance of the rapidly growing labor force necessary to provide care for older Americans. *See Hilliard Dev. Corp.*, 187 F.3d 133. Unless we re-examine our precedents and attempt to provide some flexibility for our constructions of § 2(11) in nursing home cases, we will someday find ourselves in the absurd position of holding that nurses are "supervisors" in a case in which they actually outnumber their aides.